1   ROB BONTA
    Attorney General of California
2   MICHAEL L. NEWMAN
    Senior Assistant Attorney General
3   CHRISTINE CHUANG
    Supervising Deputy Attorney General
4   KELLY PERCIVAL
    ROBIN L. GOLDFADEN, State Bar No. 208055
5   Deputy Attorneys General
      455 Golden Gate Avenue
6     San Francisco, CA 94102
      Telephone: (415) 510-3543
7     E-mail: Robin.Goldfaden@doj.ca.gov
    *Attorneys for Respondent*
8     Michelle Baass, Director, California
      Department of Health Care Services
9

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE CENTRAL DISTRICT OF CALIFORNIA

12

13

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Case No. 2:25-mc-00083 |
| Petitioner, | **RESPONDENT'S OPPOSITION TO PETITION TO ENFORCE HSI ADMINISTRATIVE SUBPOENA NO. HSI-LA-2025-063746-001** |
| **v.** | |
| **MICHELLE BAASS, DIRECTOR, CALIFORNIA DEPARTMENT OF HEALTH CARE SERVICES,** | Date: October 16, 2025<br>Time: 11:00 a.m.<br>Courtroom: 790<br>Judge: The Honorable Stephanie S. Christensen |
| Respondent. | Action Filed: August 19, 2025 |

# **TABLE OF CONTENTS**

**Page**

Introduction .................................................................................... 1

Background .................................................................................... 3

    I.     Procedural History ............................................................ 3

    II.    California's Medi-Cal Program ......................................... 5

    III.   Subpoenaed Records and Costs of Producing Them ........... 7

Argument ....................................................................................... 8

    I.     Standard for Review of Subpoena ..................................... 8

    II.    *Peters* Prohibits Fishing Expeditions ................................ 9

        A.    HSI's "Fishing Expedition" Subpoena Should Be Quashed ................................................................... 9

        B.    *Peters* Was Correctly Decided ............................. 11

    III.   HSI Has No Viable Investigation for Which the Subpoenaed Records Would Be Relevant or Material ............................. 12

    IV.   Improper Motive is a Serious Concern ............................. 15

    V.    The Subpoena is Not Reasonable ..................................... 15

    VI.   The INA Does Not Authorize Enforcement of an Administrative Subpoena Against the State ....................... 16

    VII.  HSI's Subpoena Violates the Tenth Amendment .............. 19

    VIII. HSI's Subpoena, If Enforced, Would Circumvent a Court Order and Violate the Administrative Procedure Act ..................... 21

Conclusion ................................................................................... 22

# TABLE OF AUTHORITIES

**Page**

C<small>ASES</small>

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*
    458 U.S. 592 (1982) ................................................................. 14

*Bond v. United States*
    572 U.S. 844 (2014) ................................................................. 17

*California, et al. v. U.S. Dep't of Health & Hum. Servs., et al.*
    No. 25-cv-05536-VC, 2025 WL 2356224 (N.D. Cal. Aug. 12,
    2025) .............................................................................. *passim*

*City & Cnty. of San Francisco v. Garland*
    42 F.4th 1078 (9th Cir. 2022) ..................................................... 19

*Cnty. of Ocean v. Grewal*
    475 F. Supp. 3d 355 (D.N.J. 2020) ................................................ 19

*Colautti v. Franklin*
    439 U.S. 379 (1979) ................................................................. 13

*Dominguez v. Super. Ct.*
    226 Cal. App. 3d 524 (Ct. App. 1990) ............................................... 5

*E.E.O.C. v. K-Mart Corp.*
    694 F.2d 1055 (6th Cir. 1982) ..................................................... 12

*F.D.I.C. v. Garner*
    126 F.3d 1138 (9th Cir. 1997) ..................................................... 12

*Gregory v. Ashcroft*
    501 U.S. 452 (1991) ............................................................. 17, 19

*In re Administrative Subpoena No. 25-1431-019*
    No. 1:25-mc-91324-MJJ, 2025 WL 2607784 (D. Mass. Sept. 9,
    2025) .......................................................................... 12, 15

*In re Ramirez*
    905 F.2d 97 (5th Cir. 1990) ........................................................ 9

# TABLE OF AUTHORITIES
## (continued)

Page

*Jacobson v. Commonwealth of Massachusetts*
    197 U.S. 11 (1905) ................................................................................ 20

*Kearns v. Cuomo*
    981 F.3d 200 (2d Cir. 2020) ............................................................ 13, 14

*Lewis v. Grinker*
    965 F.2d 1206 (2d Cir. 1992) .................................................................. 5

*Peters v. United States*
    853 F.2d 692 (9th Cir. 1988) ......................................................... *passim*

*Printz v. United States*
    521 U.S. 898 (1997) ....................................................................... 18, 20

*Return Mail, Inc. v. U.S. Postal Serv.*
    587 U.S. 618 (2019) ............................................................................ 18

*U.S. Immigr. & Customs Enf't v. Gomez*
    445 F.Supp.3d 1213 (D. Colo. 2020) .................................................. 20

*United States v. Bisceglia*
    420 U.S. 141 (1975) ....................................................................... 11, 12

*United States v. California*
    921 F.3d 865 (9th Cir. 2019) ................................................... 4, 19, 20

*United States v. Golden Valley Elec. Ass'n*
    689 F.3d 1108 (9th Cir. 2012) ..................................................... *passim*

*United States v. Hansen*
    599 U.S. 762 (2023) ............................................................................ 13

*United States v. Minker*
    350 U.S. 179 (1956) ...................................................................... 17, 19

*United States v. Morton Salt Co.*
    338 U.S. 632 (1950) ....................................................................... 9, 13

*United States v. Powell*
    379 U.S. 48 (1964) ............................................................................. 15

# TABLE OF AUTHORITIES
## (continued)

**Page**

**STATUTES**

United States Code Title 1
   § 1 ........................................................................................................ 18

United States Code Title 5
   § 704 .................................................................................................... 21
   § 706(2) ................................................................................................ 21

United States Code Title 8
   § 1101 ................................................................................................... 18
   § 1101(a)(3) ......................................................................................... 18
   § 1101(a)(10) ....................................................................................... 18
   § 1101(a)(28) ....................................................................................... 18
   § 1101(a)(36) ................................................................................. 13, 18
   § 1101(a)(42) ....................................................................................... 18
   § 1101(a)(43)(K)(iii) ........................................................................... 18
   § 1101(a)(49) ....................................................................................... 18
   § 1101(b)(1) ......................................................................................... 18
   § 1101(b)(1)(G)(i)(II) .......................................................................... 18
   § 1101(b)(1)(G)(3) .............................................................................. 18
   § 1101(b)(3) ......................................................................................... 13
   § 1225(d) .............................................................................................. 16
   § 1225(d)(4) .......................................................................... 3, 18, 19, 21
   § 1225(d)(4)(B) ............................................................................... 9, 18
   § 1324 ...................................................................................... 12, 13, 14
   § 1325 ................................................................................................... 10
   § 1326 ................................................................................................... 10
   § 1357(g) .............................................................................................. 19
   § 1373 ................................................................................................... 19
   § 1612(b) ................................................................................................ 6
   § 1613(a) ................................................................................................ 6
   § 1621(d) .............................................................................................. 14

United States Code Title 26
   § 7609 ................................................................................................... 11

# TABLE OF AUTHORITIES
## (continued)

**Page**

United States Code Title 42
    § 1320b-7(d)(1)(B)(3) ................................................................ 6
    § 1396b(v) ................................................................................ 5
    § 1396b(v)(5)(B) ...................................................................... 6

California Welfare & Institutions Code
    § 14007.8 ................................................................................. 5

CONSTITUTIONAL PROVISIONS

U.S. Constitution, Tenth Amendment .................................................. *passim*

REGULATIONS

Code of Federal Regulations Title 42
    § 435.406(b) ........................................................................... 14
    § 435.907(b) ............................................................................. 7
    § 440.255 ................................................................................. 5

OTHER AUTHORITIES

Cal. Senate Bill 184 (2021-2022 Reg. Sess.)
    § 19 ................................................................................. 8, 21

v

# INTRODUCTION

The United States seeks enforcement of an administrative subpoena that Homeland Security Investigations (HSI), a division of U.S. Immigration and Customs Enforcement (ICE) within the Department of Homeland Security (DHS), served on Respondent, the Director of the California Department of Health Care Services (DHCS). HSI's subpoena is breathtaking in its disregard for the law. It should not be enforced.

HSI seeks production of low-income Californians' applications for Medi-Cal, a State-administered, and for some, an entirely State-funded, program that protects the health of California's residents. The applications include a wealth of sensitive, personally identifying information—from social security numbers and home addresses to race, pregnancy status, disability, income, and employment—for both applicants and their household members. Applicants provide this information through a federally approved application form that tells them their information will be kept private and secure, and used only for limited purposes. Now, HSI demands thousands upon thousands of these applications for immigration enforcement.

The sole narrowing of the scope of HSI's demand is that the applicant not have checked "yes," in response to the question of whether they had "satisfactory immigration status." This request captures information of applicants' household members and the applications of lawful permanent residents, Deferred Action for Childhood Arrivals (DACA) recipients, and others who have lawful immigration status or other permission to be in the United States but lack "satisfactory immigration status"—a defined term that differs from whether one has lawful immigration status.

"Satisfactory immigration status" determines what federally funded Medicaid covers, but little else in California because a State-funded program picks up where federally funded Medicaid leaves off, so that nearly all the State's residents have health coverage, regardless of immigration status. With this expansion, California's

1

1  Medicaid program, known as Medi-Cal, covers approximately 40 percent of
2  Californians.

3      Petitioner's theory is that, within the pool of Medi-Cal applicants who did
4  not claim "satisfactory immigration status," HSI may find persons to investigate for
5  violations of the Immigration and Nationality Act (INA). However, controlling
6  precedent—*Peters v. United States*, 853 F.2d 692 (9th Cir. 1988)—prohibits use of
7  administrative subpoenas to conduct such fishing expeditions. Petitioner attempts to
8  distinguish *Peters*, but mainly argues that *Peters* was wrongly decided. *Peters* was
9  correctly decided; it is binding; and it dictates that HSI's subpoena be quashed,
10 because it is for an impermissible fishing expedition.

11     Respondent pointed to *Peters* in objecting to HSI's subpoena. Now,
12 Petitioner claims HSI is investigating Respondent for possibly violating the INA's
13 prohibition against "harboring," and somehow the applications it demands will bear
14 on this newly identified investigation. Petitioner's theory—that DHCS, in
15 administering the Medi-Cal program, knowingly or recklessly "induces" or
16 "encourages" noncitizens without lawful immigration status to enter or remain in
17 the United States—is untenable. The harboring statute applies to *persons*, not to
18 State agencies or agency directors in their official capacity; harboring requires a
19 *mens rea* that could not be established in Medi-Cal's operation; and critically,
20 Medi-Cal is a *lawful* program. Federal law *requires* coverage for emergency
21 Medicaid services for all income-eligible individuals, regardless of immigration
22 status, and the State's provision of "full scope" benefits to individuals without
23 "satisfactory immigration status" is a State prerogative and consistent with express
24 Congressional authorization. There is thus no scenario in which *any* of the
25 information contained in the subpoenaed applications would be relevant or material
26 to an investigation that HSI has authority to pursue against DHCS, its Director, or
27 employees for administering the Medi-Cal program. Additionally, HSI's subpoena
28 cannot pass the test of "reasonableness," including because it would impose

2

immense burden on the State.

But the problems with HSI's subpoena run deeper, for the INA's administrative subpoena power, 8 U.S.C. § 1225(d)(4), does not convey authority to force States to do the bidding of federal immigration officers. Section 1225(d)(4)'s express language does not include sovereigns like the State, and Supreme Court precedent strongly counsels against inferring enforceable administrative subpoena power over the States in the absence of clearly expressed Congressional intent to convey such authority.

The subpoena here proves the prescience of Congress in withholding such power. The burden HSI's subpoena would impose is staggering, not just fiscally, but in the harm it would cause to the Medi-Cal program and California's sovereign interest in ensuring public health. Burden of this magnitude is not simply a basis for quashing the subpoena but also violates the Tenth Amendment.

The Petition should be denied, and the subpoena quashed.

## BACKGROUND

### I.   PROCEDURAL HISTORY

On June 10, 2025, HSI, electronically and by mail, sent an administrative subpoena to DHCS through its Director, demanding production of "[a]ny submitted application for Medi-Cal benefits submitted between June 5, 2021[,] and the present, where the applicant did not answer yes to the question 'Does this person have satisfactory immigration status?'" Declaration of Katie Konz (Konz Decl.) ¶¶ 4-5, Ex. A.[1] Days later, DHCS informed HSI it was rejecting the subpoena as ineffective under *Peters v. United States*, 853 F.2d 692, 699 (9th Cir. 1988). Konz

---

[1] The version of the subpoena attached as Exhibit A to the Declaration of Eddy Wang (Wang Decl.) (Dkt. 1-1) does not include the complete copy of the Medi-Cal application included with the mailed subpoena. A correct copy is provided as Exhibit A to the Konz Declaration.

1  Decl., Ex. B.

2      DHCS heard nothing further from HSI until after this Court, on September 3,

3  2025, ordered (Dkt. 6) Petitioner to serve its Petition (Dkt. 1), filed two weeks

4  earlier. Upon receiving the Petition, Respondent learned for the first time that HSI

5  claims now to be investigating DHCS. Konz Decl. ¶ 6.[2] Petitioner has not otherwise

6  communicated with DHCS about this matter since HSI issued its subpoena. Even

7  now, it has offered only the declaration of an agent who does not profess to have

8  personal knowledge or involvement in the subpoena's issuance. *See* Wang Decl.

9  Administration officials have, however, publicly threatened to employ the

10  harboring statute against jurisdictions that decline to dedicate State or local

11  resources to federal immigration law enforcement,[3] notwithstanding decisions such

12  as *United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019), recognizing the

13  rights of States not to be forced into carrying out federal immigration programs.

14      The Petition was filed one week after the U.S. District Court for the Northern

15  District of California preliminarily enjoined DHS from using Medicaid data,

16  obtained from California and other plaintiffs, for immigration enforcement.

17  *California, et al. v. U.S. Dep't of Health & Hum. Servs., et al.*, No. 25-cv-05536-

18  VC, 2025 WL 2356224, at *2 (N.D. Cal. Aug. 12, 2025), attached as Exhibit A to

19  Respondent's Request for Judicial Notice (RJN). The Court also preliminarily

20  enjoined Centers for Medicare and Medicaid Services (CMS) from sharing

---

21      [2] The Petition was filed under the authority of Bilal A. Essayli in his claimed

22  capacity of Acting United States Attorney. Respondent is aware that he is the

23  subject of motions for disqualification. Respondent's Opposition does not constitute

    a waiver of the issue of Mr. Essayli's disqualification, including as relates to those

24  working under his authority and direction. Respondent reserves the right to seek

25  disqualification but is not requesting recusal of the magistrate judge to whom the

    Petition has been assigned.

26      [3] *See, e.g.*, Am. Immigr. Lawyers Ass'n, AG Sends Letters to Leadership of

27  Sanctuary Jurisdictions (Aug. 13, 2025) (last visited Sept. 24, 2025) (compiling

    letters from Attorney General Bondi to states, counties, and cities the Trump

28  administration has labeled "sanctuary" jurisdictions).

California's Medicaid data with DHS for immigration enforcement purposes. *Id.* States brought that litigation after learning CMS had disclosed vast quantities of Californians' personally identifying information to DHS, without public notice and contrary to past assurances regarding confidentiality and privacy.

## II.  CALIFORNIA'S MEDI-CAL PROGRAM

Enacted in 1965, Medicaid is a "cooperative federal/state cost-sharing program" designed to ensure that low-income persons have access to healthcare. *Lewis v. Grinker*, 965 F.2d 1206, 1208 (2d Cir. 1992). Federal Medicaid law does not authorize the use of federal funds to cover non-emergency healthcare services provided to certain noncitizens, but states may use their own funds to cover services for whatever populations they so choose. *See, e.g.*, *Dominguez v. Super. Ct.*, 226 Cal. App. 3d 524, 528 (Ct. App. 1990). California has chosen to do so. Its law mandates that state-funded healthcare coverage be provided via Medi-Cal to income-qualifying populations not eligible for federal funding.

With more than 14.5 million current enrollees, Medi-Cal is the largest of any state Medicaid program in the nation. Insuring approximately 40 percent of California's population, including more than half of California's children, Medi-Cal is essential to the health of California families.

DHCS is the single State agency responsible for administering Medi-Cal. Under federal law, federal funds must be used to pay for emergency services for all Medi-Cal recipients, regardless of immigration status. *See* 42 U.S.C. § 1396b(v); 42 C.F.R. § 440.255. For non-emergency services, federal funding covers only those enrollees who have what federal program rules call "satisfactory immigration status" ("SIS") and meet other eligibility criteria. For those who do not meet the federal definition of SIS (referred to as "unsatisfactory immigration status" or "UIS" enrollees), California has created its own program that covers non-emergency services using state funds alone. *See* Cal. Welf. & Inst. Code § 14007.8.

Lacking SIS for Medicaid eligibility purposes is not the same as lacking

5

lawful immigration status. "Satisfactory immigration status" is a categorization specific to and defined for Medicaid purposes. *See* 42 U.S.C. § 1320b-7(d)(1)(B)(3). The category excludes many who have lawful immigration status or other permission to be present in the United States. *See* 42 U.S.C. § 1396b(v)(5)(B) (defining SIS to include "an alien lawfully admitted for permanent residence as an immigrant as defined by sections 1101(a)(15) and 1101(a)(20) of Title 8," while "excluding, among others, alien visitors, tourists, diplomats, and students"). For example, most lawful permanent residents are ineligible for federally funded non-emergency Medicaid for the first five years of their lawful permanent residency and lack SIS during that time. *See* 8 U.S.C. §§ 1612(b), 1613(a). Other categories of persons lacking SIS include DACA recipients and student and work visa holders over age 21. Declaration of Yingjia Huang (Huang Decl.) ¶¶ 7, 9, Ex. A. In a given month, there can be approximately two million UIS Medi-Cal enrollees eligible to receive State-funded non-emergency healthcare services. *Id.* ¶¶ 12-14, 16.

To determine if a Medi-Cal applicant has SIS, DHCS utilizes a federal database. Upon receiving an applicant's data, if the individual or family member is not a U.S. citizen and has provided an "alien registration number," the State uses that data to check the Systematic Verification of Alien Entitlement ("SAVE"), operated by DHS; SAVE indicates whether an applicant has SIS, and the applicant's case file becomes coded to reflect that determination. *Id.* ¶¶ 30-32. Noncitizen applicants who have not provided an alien registration number are coded as UIS. *Id.* ¶ 33.

Medi-Cal enrollees are not informed of whether the healthcare services received are reimbursed by state or federal funds. When a Medi-Cal enrollee receives a service, the enrollee presents their Medi-Cal identification card to the provider, and the provider uses that card to confirm eligibility through the Medi-Cal provider portal. *Id.* ¶ 34. Billing is then determined electronically based on coding employed by an automated computer process. *Id.*

### III.  SUBPOENAED RECORDS AND COSTS OF PRODUCING THEM

There is no simple way for DHCS to identify and produce the requested Medi-Cal applications. Producing the applications would impose extreme costs on DHCS—requiring DHCS to expend extensive time, work with the 58 counties that receive and process most Medi-Cal applications, develop queries for databases that house Medi-Cal data, and cover the significant costs of necessary system integration vendors and data analysts. *Id.* ¶¶ 42-47.

Because Medi-Cal data is constantly updated in California's databases, no simple query can identify applicants' responses to questions on their original applications. Identifying the records would likely require manually inspecting—by opening and navigating to the original application data—the individual electronic case file of every Medi-Cal application the State has received since June 5, 2021. *Id.* ¶¶ 44-45. For reference, in May 2025, California received 127,579 applications; in July 2025, it received 123,591. *Id.* ¶ 17. Completing the process for responding to the subpoena, including manual reviews of potentially responsive files, likely would involve tens of thousands of hours and take more than a year. *Id.* ¶¶ 45, 47. DHCS would need to cover the substantial direct financial costs involved and manage the impact of State and county workers being pulled from their duties to carry out the added work. *Id.* ¶¶ 42, 46, 48.

The applications, moreover, include sensitive information about applicants' family members and other household members, such as family members' physical and mental disabilities, pregnancy status, and expected delivery dates of pregnant persons. *Id.* ¶¶ 19-20. The Medi-Cal application, approved by the federal government, 42 C.F.R. § 435.907(b), assures applicants, "**We keep your information private and secure as required by law**. We'll use your information only to see if you qualify for health insurance."[4] Konz Decl. Ex. A (original

---

[4] Another form, allowing residents to apply for multiple State-administered
(continued…)

7

emphasis).

DHCS has assured Medi-Cal enrollees that their data, including immigration status information, is used only for the administration of the program and other allowable purposes. *Id.*; Huang Decl. ¶ 49. DHCS's mass disclosure of confidential Medi-Cal data to DHS would undermine these assurances and negatively impact health outcomes in California. Such disclosure may lead persons who are eligible for Medi-Cal to avoid seeking preventative care and other healthcare, including emergency medical services. Huang Decl. ¶ 50. Among other impacts, deferring care can result in late-stage disease detection, with increased morbidity and mortality, adverse effects during pregnancy, and increased spread of communicable diseases. *Id.* ¶¶ 51, 53-54. The brunt of these impacts will be borne by California's most vulnerable communities, including those most likely to fear being targeted by the federal government, *id.* ¶ 52, but the larger public and the State also bear costs when timely access to care is impeded, *id.* ¶¶ 50, 53-56, as California's Legislature recognized. *See, e.g.*, Cal. Senate Bill 184 (2021-2022 Reg. Sess.) Section 19 (legislative findings supporting expansion of Medi-Cal to cover care of low-income adults not eligible for Medicaid coverage).

## ARGUMENT

### I.    STANDARD FOR REVIEW OF SUBPOENA

An administrative subpoena, including one issued under the INA, may not be "too indefinite or broad." *Peters*, 853 F.2d at 699. In determining whether to enforce or quash a subpoena, critical questions before the Court are: "(1) whether

---

programs, including Medi-Cal, using one application, states: "You have the right to: Have information given to the County kept confidential, unless directly related to the administration of County programs." It further states: "Immigration information is private and confidential. The immigration status of noncitizens who are eligible and apply for benefits will be checked with the U.S. Citizenship and Immigration Services (USCIS). Federal law says the USCIS cannot use the information for anything else except cases of fraud." Huang Decl. ¶ 24.

1    Congress has granted the authority to investigate; (2) whether procedural

2    requirements have been followed; and (3) whether the evidence is relevant and

3    material to the investigation." *United States v. Golden Valley Elec. Ass'n*, 689 F.3d

4    1108, 1113 (9th Cir. 2012) (citation omitted).[5]

5        A "reasonableness" inquiry must also be satisfied, even where other criteria

6    are met. *Id.* "[T]he requirement of reasonableness . . . comes down to whether

7    specification of the documents to be produced is adequate, but not excessive, for the

8    purposes of the relevant inquiry[,]" and a subpoena should not be enforced if "the

9    party being investigated proves the inquiry is unreasonable because it is overbroad

10    or unduly burdensome." *Id.* at 1115 (internal punctuation and citations omitted).

11    "[A] governmental investigation . . . may be of such a sweeping nature and so

12    unrelated to the matter properly under inquiry as to exceed the investigatory

13    power." *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950).

14        HSI's subpoena fails at every point of the required inquiry.

15    **II.**    *PETERS* **PROHIBITS FISHING EXPEDITIONS**

16        **A.**    **HSI's "Fishing Expedition" Subpoena Should Be Quashed**

17

18        In seeking enforcement, HSI alludes to "possible violations" of Title 8—the

19    entirety of the INA—by one or more unnamed, unknown persons who *may* be

20    among applicants for Medi-Cal who did not claim "satisfactory immigration

21    status." Pet. at 12. HSI's fishing expedition is not permitted under binding Ninth

22    Circuit precedent. *Peters*, 853 F.2d at 699-700. In *Peters*, immigration authorities

23    conducting "a general criminal investigation of a group of unnamed tenants . . . who

24    may be undocumented aliens" sought enforcement of a subpoena to a labor camp

25    that provided housing for approximately 150 families. *Id.* at 693. The immigration

26    officer there attested to having arrested approximately 300 undocumented

27         [5] A subpoena issued under the INA is not self-executing. Only a court order

28    can render such a subpoena enforceable. *See* 8 U.S.C. § 1225(d)(4)(B); *In re
Ramirez*, 905 F.2d 97, 98 (5th Cir. 1990).

1    individuals at the camp over an 11-year period and having received "numerous

2    complaints" of undocumented persons at the camp. *Id.* at 695. The Court

3    nonetheless quashed the subpoena, holding that "[a]n administrative subpoena . . .

4    may not be so broad so as to be in the nature of a 'fishing expedition,'" and, further,

5    the INA provision allowing issuance of administrative subpoenas "does not

6    authorize . . . a blanket John Doe subpoena where the targets of a general

7    investigation are unknown." *Id.* at 700.

8         HSI's justification here is even more lacking than in *Peters*. Rather than

9    seeking information about specific or identifiable targets among Medi-Cal

10   applicants who did not claim "satisfactory immigration status" (not the equivalent

11   of lacking lawful immigration status), the subpoena seeks *thousands* of

12   applications, containing sensitive and personally identifying information, from

13   disability status to income—and addresses—so that HSI can fish for presently

14   unknown persons who may lack lawful immigration status and pursue their

15   removal. Pet. (Dkt. 1) ¶ 14; Pet'r's' Mem. at 7.[6] Under *Peters*, this is not a

16   permissible use of the administrative subpoena power.

17        Many thousands of applications are potentially responsive to the subpoena,

18   and most would include private and personally identifying information about many

19   more thousands of individuals who may not have applied for Medi-Cal but share a

20   home with an applicant who lacks "satisfactory immigration status." Huang Decl.

---

21        [6] Petitioner also hints that some among the thousands who have applied for
22   Medi-Cal may have entered or re-entered the United States in violation of one of
     two criminal provisions of the INA, 8 U.S.C. § 1325 or 8 U.S.C. § 1326. Pet'r's
23   Mem. at 8. Petitioner notes these two provisions in passing, seemingly to say that
     their enforcement is a "type of enforcement [that] falls squarely within the broad
24   scope of inquiry authorized in § 1225(d)(4)(A)." *Id.* However, neither the Wang
     Declaration nor the Petition states that HSI is investigating particular Medi-Cal
25   applicants for such potential violations, nor do they claim that Medi-Cal
26   applications would be relevant to such an investigation. The subpoena thus fails
     under *Golden Valley*, 689 F.3d at 1113—the requirement of relevance and
27   materiality to an investigation cannot be satisfied where there is no investigation.
28

¶ 20. And because lacking "satisfactory immigration status" for Medicaid purposes does not equate with lacking lawful immigration status, HSI would receive broad swaths of information of many thousands of others with lawful immigration status. *Id.* ¶¶ 9. 17. This would all be done in service not of investigating a target, but in the hope of finding one.

*Golden Valley*, invoked by Petitioner, serves only to highlight the difference between a lawful use of the subpoena authority and HSI's current attempt. There, the subpoena sought company records related to electricity consumption at three specified addresses that the DEA suspected were involved in the manufacture and distribution of controlled substances. 689 F.3d at 1111. The *Golden Valley* Court easily distinguished the subpoena from that in *Peters*. *Id.* at 1115. The targeted *Golden Valley* subpoena similarly stands in sharp contrast to HSI's.

## B. *Peters* Was Correctly Decided

Petitioner asserts that *Peters* was wrongly decided. It was not. Petitioner misapprehends *United States v. Bisceglia*, 420 U.S. 141 (1975), *partially superseded by statute*, 26 U.S.C. § 7609, which the *Peters* Court distinguished. *Bisceglia* involved a different subpoena-authorizing statute, but importantly, did not approve a broad fishing expedition. The subpoena there sought to identify the source of two specific, suspicious bank deposits. *Id.* at 142-44. The Court approved the subpoena as narrowed by the district court for the specific facts before it, as emphasized by the concurring Justices:

> The summons, in short, was issued pursuant to a genuine investigation. The Service was not engaged in researching some general problem; its mission was not exploratory. The distinction between an investigative and a more general exploratory purpose has been stressed appropriately by federal courts, and that distinction is important to our decision here.

*Id.* at 152 (Blackmun, J., concurring) (citations omitted). *Bisceglia* in no way

supports Petitioner. Indeed, Petitioner has not pointed to a single instance of a court enforcing an administrative subpoena with a purpose and scope remotely akin to HSI's subpoena here.[7]

And for good reason. As *Bisceglia* recognized, and as seen here, the administrative subpoena power can easily be abused. 420 U.S. at 146, 150-51; *cf. In re Administrative Subpoena No. 25-1431-019*, 2025 WL 2607784, at *7 (quashing subpoena where "true purpose . . . is to interfere with the [State's] right to protect [gender-affirming care] within its borders, to harass and intimidate [the subpoena recipient] to stop providing such care, and to dissuade patients from seeking such care").

### III. HSI HAS NO VIABLE INVESTIGATION FOR WHICH THE SUBPOENAED RECORDS WOULD BE RELEVANT OR MATERIAL

Petitioner now also claims it is investigating whether DHCS "knowingly and willfully facilitate[s] the provision of nonemergency medical care to aliens who do not possess 'satisfactory immigration status' through California's Medicaid program, thereby inducing and/or encouraging such aliens to remain in the United States unlawfully." Wang Decl. ¶ 3. According to Petitioner, the subpoenaed applications are "relevant" to an investigation as they "will allow the United States to evaluate whether DHCS has and continues to knowingly and willfully facilitate the provision of government benefits to individuals with unsatisfactory immigration status through California's Medicaid program, which may help to prove violations of Title 8, including 8 U.S.C. § 1324," Wang Decl. ¶ 5, which imposes criminal penalties for "harboring" undocumented noncitizens.

---

[7] The principle enunciated in *Peters* extends beyond subpoenas issued under the INA, *see, e.g.*, *Golden Valley*, 689 F.3d at 1113; *F.D.I.C. v. Garner*, 126 F.3d 1138, 1146 (9th Cir. 1997), and beyond the Ninth Circuit, *see, e.g.*, *E.E.O.C. v. K-Mart Corp.*, 694 F.2d 1055, 1066 (6th Cir. 1982); *In re Administrative Subpoena No. 25-1431-019*, No. 1:25-mc-91324-MJJ, 2025 WL 2607784, at *6 (D. Mass. Sept. 9, 2025).

Even if there was a tenable theory for HSI's asserted investigation, the subpoena would be sweeping and overbroad. It seeks four years of applications of anyone who did not claim "satisfactory immigration status" when they applied, which includes persons with lawful immigration status and sensitive, private information about household members of applicants who did not indicate SIS.

More critically, Petitioner could never prove a charge of harboring by the State or its employees for involvement in administering Medi-Cal.

First, "[Section] 1324 applies to 'person[s],' not government entities . . ., [and] the [Supreme] Court [has] noted the 'longstanding interpretive presumption that "person" does not include the sovereign' or government agencies." *Kearns v. Cuomo*, 981 F.3d 200, 212 (2d Cir. 2020) (citation omitted). And, where it defines the term, the INA provides that "person" means an "individual" or "organization," 8 U.S.C. § 1101(b)(3), and separately defines "State," 8 U.S.C. § 1101(a)(36). By the INA's terms, the State is not a "person" and is not subject to Section 1324. *See Colautti v. Franklin*, 439 U.S. 379, 392-93 & n. 10 (1979) ("As a rule, [a] definition which declares what a term means . . . excludes any meaning that is not stated.") (internal quotation marks omitted). As a State agency, DHCS could not be prosecuted for a violation of Section 1324, nor could an agency head in her official capacity be. *See Kearns*, 981 F.3d at 212 (government official and agency faced no credible threat of prosecution for harboring because Section 1324 applies to persons, not government entities). There are thus no records that could be relevant or material to the claimed investigation. *See Morton Salt Co.*, 338 U.S. at 652.

Relatedly, "harboring" under Section 1324, requires *mens rea*. *See, e.g.*, *United States v. Hansen*, 599 U.S. 762, 778-79 (2023); *Kearns*, 981 F.3d at 209.[8] Medi-Cal's administration relies on numerous state and county personnel, each

---

[8] Section 1324(a)(1)(A)(iv) provides that "any person who . . . encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law . . . shall be punished . . . ."

13

involved at discrete stages, and, at key points, processes involve databases communicating with one another. Huang Decl. ¶¶ 26-34. None of these individuals could conceivably violate Section 1324 through involvement in Medi-Cal's operation. The process from an individual submitting an application to approval for coverage to receipt of and payment for care is so fragmented and, to a significant extent automated, that no human involved would have the requisite knowledge and opportunity to violate Section 1324 (including because an individual may lack SIS and still have lawful immigration status).

Petitioner's real complaint appears to be with California having opted to fund healthcare for those without SIS.[9] But California's state-funded program is *legal* under federal law, 8 U.S.C. § 1621(d), and within the State's prerogative as a sovereign entity to offer its residents for the benefit of public health. *See, e.g.*, *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607, 609 (1982). An agency and its employees cannot commit the offense of harboring by virtue of administering a lawful program. *Kearns*, 981 F.3d at 208 ("The theory that issuing standard licenses constitutes criminal harboring is directly at odds with federal law that expressly permits the issuance of such licenses."); *id.* at 209 (even if driver's licenses were a material comfort, "Kearns [in issuing licenses] would be acting in a purely ministerial capacity, performing a duty assigned . . . by his employer, [and consequently] would not be subject to prosecution under § 1324").

Because no information revealed by the subpoenaed records could be relevant or material in any way to a harboring investigation, the subpoena should be quashed.

---

[9] Petitioner appears to take issue with emergency health coverage. Petitioner acknowledges the Emergency Medical Treatment & Labor Act (EMTALA) requires the provision of emergency medical care and federal law authorizes use of federal Medicaid dollars to pay for "emergency care" received by income-eligible individuals without regard for immigration status (indeed, 42 C.F.R. § 435.406(b) *requires* such payments), but Petitioner's subpoena seeks records without regard for whether the applicant received only emergency health coverage.

14

## IV.  IMPROPER MOTIVE IS A SERIOUS CONCERN

An administrative subpoena must be issued for a congressionally authorized purpose, but an agency cannot use a subpoena "to harass the [recipient] or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *United States v. Powell*, 379 U.S. 48, 58 (1964).

The manner in which the government has proceeded here raises the question of improper motive. *Cf. In re Admin. Subpoena No. 25-1431-019*, 2025 WL 2607784 (quashing subpoena). Upon being alerted to *Peters*, HSI engaged no more with DHCS. Instead, in a Petition filed months later, it asserted for the first time, using a declarant with no personal knowledge, that it is investigating DHCS for harboring, seemingly following through on Administration threats to bring harboring charges against jurisdictions that lawfully do not employ State resources to facilitate federal immigration enforcement. *See supra* p. 4. Moreover, Petitioner surely knows now that the subpoena it is asking this Court to enforce seeks records covered by another court's Order enjoining DHS from using Medicaid data for immigration enforcement purposes. *See California*, 2025 WL 2356224 at *2, RJN, Ex. A.

## V.  THE SUBPOENA IS NOT REASONABLE

Even if the other criteria were met by HSI's subpoena, an administrative subpoena should not be enforced where it cannot meet the test of "reasonableness," whether because it is excessive, overbroad, or unduly burdensome. *See, e.g.*, *Golden Valley*, 689 F.3d at 1115. The subpoena here is all three. Whether for the dead-on-arrival harboring investigation of DHCS or the larger fishing expedition HSI wishes to conduct, the subpoena is excessive and overbroad in seeking the personal information of potentially millions of individuals and the entirety of responsive applications, which include information such as applicants' and their family members' names, home addresses, race, employment, pregnancy status, and

1  disability status. Huang Decl. ¶¶ 16, 19-20.

2       Moreover, if enforced, HSI's subpoena would impose a staggering

3  administrative and fiscal burden. To identify a process by which to collect the

4  subpoenaed applications, DHCS would have to expend months of time working

5  with a vendor to develop a query able to identify the universe of potentially

6  responsive case files in the database that houses Medi-Cal data. *Id.* ¶ 43. Once

7  identified, personnel would need to manually open each file and review individual

8  applications. *Id.* ¶¶ 44-45. DHCS estimates that responding to the subpoena would

9  involve tens of thousands of hours and take more than a year to complete. *Id.* ¶¶ 45,

10  47. The process would pull state and county employees away from their ordinary

11  functions in implementing DHCS's critical programs for Californians, with huge

12  costs to the State. *See id.* ¶¶ 42-48. There is no question this subpoena is unduly

13  burdensome.

14       But here, the burden is not simply the diminishment of a company's bottom

15  line—it is the diversion of tax-payer-funded public resources and resulting harm to

16  the State's programs and fisc. The production of such sensitive, personal data

17  would cause substantial, irreversible harm to public trust and California's ability to

18  protect the health of its residents. *Id.* ¶¶ 50, 56. In this additional regard, the

19  subpoena would impose burden that is not merely "undue"—if enforced, this

20  subpoena would strike a devastating blow to the Medi-Cal program, with cascading

21  adverse impacts on public health. *See, e.g.*, *id.* ¶¶ 48-56.

22  ## VI. THE INA DOES NOT AUTHORIZE ENFORCEMENT OF AN
23         ADMINISTRATIVE SUBPOENA AGAINST THE STATE

24       Agencies do not have inherent authority to issue administrative subpoenas. In

25  evaluating an administrative subpoena, a court must address whether the subpoena

26  is within the agency's statutory authority. Vis-à-vis States, the answer to this

27  foundational question is that authority is lacking here.

28       The authority vested in immigration authorities by 8 U.S.C. § 1225(d) is

admittedly broad. Indeed, in the only case that squarely presented the Supreme Court with the question of its scope, the Court remarked on its breadth, its potential for abuse, and the concomitant need for a restrictive interpretation of ambiguous terms. *See United States v. Minker*, 350 U.S. 179, 187 (1956). Notably, however, while acknowledging the breadth of the subpoena power, *Minker* held that the agency did not have authority for the subpoena it had issued. *Id.* at 190. At issue there was whether the subjects of denaturalization investigations were "witnesses" within the meaning of the power to require "by subpoena the attendance and testimony of 'witnesses' before immigration officers." *Id.* at 186. Finding the term ambiguous, the Court concluded it did not. *Id.* at 190 ("Congress has not provided with sufficient clarity that the subpoena power granted by [8 U.S.C. § 1225] extends over persons who are the subject of denaturalization investigations; therefore Congress is not to be deemed to have done so impliedly.").

The principle applied in *Minker*—that Congress must be clear in conveying subpoena authority and should not be deemed to have done so impliedly—applies with greater force when the Federal government seeks to intrude upon State sovereignty. *See Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) ("[I]f Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.'" (citation omitted)). Given the substantial Tenth Amendment concerns that expansive administrative subpoena power over the States would raise, the expectation of a "clear statement" is especially high. *Id.* at 461 ("'In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has, in fact, faced, and intended to bring into issue, the critical matters involved in the judicial decision.'" (quoting *United States v. Bass*, 404 U.S. 336, 349 (1971))); *see Bond v. United States*, 572 U.S. 844, 859-60, 866 (2014) (requiring "clear indication" from Congress "before interpreting [a] statute's expansive language in a way that

1    intrudes on the police power of the States").

2        Far from containing a "clear statement" of intent to subject States to Federal

3    administrative subpoena power under the INA, the express language of 8 U.S.C.

4    § 1225(d)(4) does not extend to States. Subsection (A) does not specify to whom a

5    subpoena for the production of books, papers, and documents may be issued, but

6    Subsection (B) specifies that in the event of neglect or refusal to respond to a

7    subpoena issued pursuant to the statute, a district court "may . . . issue an order

8    requiring *such persons* to . . . produce books, papers, and documents if demanded . .

9    . ." 8 U.S.C. § 1225(d)(4)(B) (emphasis added). In the absence of express statutory

10   direction to the contrary, a longstanding presumption holds that "person" does not

11   include a "sovereign." *See Return Mail, Inc. v. U.S. Postal Serv.*, 587 U.S. 618,

12   626-27 (2019) (excluding the Federal government from the ordinary usage of the

13   term "person").[10] The United States Code further provides that "[i]n determining

14   the meaning of any Act of Congress, unless the context indicates otherwise, . . . the

15   words 'person' and 'whoever' include corporations, companies, associations, firms,

16   partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C.

17   § 1.[11] States are excluded from this list.

18       The INA offers no basis for rebutting the aforementioned presumption.

19   Throughout the INA's definitional provision, 8 U.S.C. § 1101, the term "person" is

20   used more than 30 times, each time in reference to humans.[12] Where "person" is

21   defined, the meaning is that of "an individual or an organization." 8 U.S.C.

22   § 1101(b)(1)(G)(3).[13]

23

24       [10] The State is a "sovereign." *See, e.g.*, *Printz v. United States*, 521 U.S. 898,

25   918 (1997) ("It is incontestible that the Constitution established a system of 'dual
     sovereignty.'").

26       [11] This definitional provision pre-dates the 1952 codification of the INA.

27       [12] *See, e.g.*, 8 U.S.C. §§ 1101(a)(3), (a)(10), (a)(42), (a)(43)(K)(iii), (a)(49),
     (b)(1), (b)(1)(G)(i)(II).

28       [13] Nor is a State an "organization." 8 U.S.C. §§ 1101(a)(28), (a)(36).

Following the example of *Minker*, *Gregory*, and most importantly, the language of the statute, this Court should not lightly assume that Section 1225(d)(4) conveys authority on immigration officers to impose the burden of an administrative subpoena on a State agency. There is nothing in Section 1225(d)(4) evincing a clear statement that Congress intended to upset the "usual constitutional balance between the States and the Federal Government." *Gregory*, 501 U.S. at 460.[14] To the contrary, the applicability of the subpoena authority only to "persons" makes clear that Congress did not intend to vest immigration authorities with the power to command the States to be at their disposal.

## VII. HSI's Subpoena Violates the Tenth Amendment

"The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz*, 521 U.S. at 935. But that is precisely what HSI wants to do here. It seeks to harness an immense quantity of DHCS resources, discussed *supra* Section V, to

---

[14] Another INA provision, 8 U.S.C. § 1373, further supports the conclusion that Section 1225(d)(4) does not convey subpoena power against States. Section 1373(a) directs that "a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the [immigration agency] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *See California*, 921 F.3d at 891-93 (Section 1373 applies only to "immigration status" information). *But see Cnty. of Ocean v. Grewal*, 475 F. Supp. 3d 355, 378 n. 20 (D.N.J. 2020) (citing cases finding Section 1373 facially unconstitutional), *aff'd sub nom. Ocean Cnty. Bd. of Commissioners v. Att'y Gen. of State of New Jersey*, 8 F.4th 176 (3d Cir. 2021); *cf., e.g.*, *City & Cnty. of San Francisco v. Garland*, 42 F.4th 1078, 1082, 1086-87 (9th Cir. 2022) (finding question of Section 1373's constitutionality moot or not ripe because state statutes at issue did not contravene Section 1373). Had Congress thought that far broader demands could easily be imposed on States through existing subpoena power, it would not have had reason to enact Section 1373. *See also* 8 U.S.C. § 1357(g) (authorizing voluntary agreements between DHS and a State or its political subdivisions to allow officers or employees of the State or subdivision to perform functions of an immigration officer).

facilitate federal immigration enforcement. Pet. at 7 ("HSI is investigating

violations of immigration law and the subpoena has been issued in support of that

investigation. Specifically: (1) the presence of individuals illegally in the United

States who are violating the immigration laws . . . ."). The Tenth Amendment does

not permit this on the facts here.[15]

California "retain[s] the ability to 'decline to administer the federal

program'" of immigration enforcement. *California*, 921 F.3d at 889 (citation

omitted). And just as Congress "could not 'impress into its service—and at no cost

to itself—the police officers of the 50 States.'" *id.* (quoting *Printz*, 521 U.S. at 922),

HSI so too cannot press DHCS into service by means of an administrative

subpoena.

The Federal government also violates the Tenth Amendment when it

"excessively interfere[s] with the functioning of state governments." *Printz*, 521

U.S. at 932. California, first and foremost, is responsible for the health, safety, and

welfare of its residents. *See, e.g.*, *Jacobson v. Commonwealth of Massachusetts*,

197 U.S. 11, 38 (1905). The State has invested significant resources into

---

[15] This Court need not determine if all DHS subpoenas violate the Tenth
Amendment because there is no question the subpoena here would do so, and
resolving the question of authority addressed in Section VI would obviate the need
to reach the constitutional question. If the Court does reach the question, *U.S.
Immigr. & Customs Enf't v. Gomez*, 445 F.Supp.3d 1213 (D. Colo. 2020), should
give it no pause. There, ICE's subpoena sought information regarding three
noncitizens who were or had been in the Sheriff's custody. This was the first known
instance of ICE using its administrative subpoena power against a local
governmental entity, and the court expressed belief that the "sterile request for
specific identifying information" pertaining to the three individuals already known
to ICE did not come close to constituting unlawful commandeering of the sheriff,
but acknowledged a point could come where requiring ongoing cooperation could
constitute commandeering. *Id.* at 1215, 1217. This Court need not assess if *Gomez*
was incorrectly decided, for the circumstances of HSI's subpoena vastly differ from
those in *Gomez*, and *Gomez* did not involve a claim of excessive interference with a
State-run program.

administering the joint federal-state Medicaid program and expanding Medi-Cal with State funds to allow residents more broadly to access healthcare. Huang Decl. ¶¶ 4-5, 12-14. The State has determined that the larger public health is vastly improved when all residents have healthcare access. *See, e.g.*, Cal. Senate Bill 184 (2021-2022 Reg. Sess.) Section 19. Toward this end, the State has made trust in Medi-Cal a cornerstone—and specifically, that DHCS will protect the confidentiality of sensitive and personally identifying information about applicants and family members. Huang Decl. ¶¶ 49-56. The violation of that trust resulting from the production of the requested documents would have devastating consequences for the State and would excessively interfere with the State's ability to carry out this sovereign function. *See id.* In this regard as well, HSI's subpoena contravenes the Tenth Amendment.

## VIII.  HSI'S SUBPOENA, IF ENFORCED, WOULD CIRCUMVENT A COURT ORDER AND VIOLATE THE ADMINISTRATIVE PROCEDURE ACT

Finally, enforcement of HSI's subpoena would allow DHS to make an end run around a preliminary injunction, issued by another court. While the records HSI seeks here differ from the data that CMS shared with DHS, they are no less covered by the preliminary injunction, which prohibits DHS from using California's Medicaid data for immigration enforcement purposes. *California*, 2025 WL 2356224, at *3.

Moreover, HSI's subpoena is subject to the Administrative Procedure Act (APA) and violates the APA in being arbitrary and capricious and contrary to law. *See* 5 U.S.C. §§ 704, 706(2); 8 U.S.C. § 1225(d)(4). In *California*, the Court has determined DHS likely violated the APA by failing to consider harmful consequences, such as significant disruptions to Medicaid's operation, "a program that Congress has deemed critical for the provision of health coverage to the nation's most vulnerable residents," prior to the agency's decision to abandon a "longstanding policy of protecting Medicaid patient information from use for

21

immigration enforcement." *California*, 2025 WL 2356224, at *3, RJN, Ex. A.

Therefore, if this Court were to consider enforcing the subpoena, Respondent respectfully requests that any decision be stayed pending final judgment in *California* and that Respondent be permitted to fully brief HSI's APA violations.

### CONCLUSION

Respondent respectfully urges the Court to deny the Petition and quash HSI's subpoena. Alternatively, Respondent requests an evidentiary hearing and the opportunity to take testimony.

Dated:  September 24, 2025                    Respectfully submitted,

ROB BONTA
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
CHRISTINE CHUANG
Supervising Deputy Attorney General
KELLY PERCIVAL
Deputy Attorney General


/s/ *Robin L. Goldfaden*
ROBIN L. GOLDFADEN
Deputy Attorney General
*Attorneys for Respondent*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Respondent, certifies that this brief contains 6,949 words, which complies with the word limit of L.R. 11-6.1.


Date:  September 24, 2025                    /s/ *Robin L. Goldfaden*
                                            ROBIN L. GOLDFADEN